## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

**Darrin C. Savage,**

        **Plaintiff,**

v.                                    Case No. 03-2609-JWL

**Delphi Corporation,**

        **Defendant.**

### MEMORANDUM AND ORDER

Plaintiff, appearing pro se, filed suit against defendant, his former employer, alleging that defendant discriminated against plaintiff on the basis of his race throughout the course of his employment and then discharged plaintiff on the basis of his race and in retaliation for plaintiff's complaining about defendant's discriminatory conduct. Plaintiff's claims are asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. This matter is presently before the court on defendant's motion for summary judgment (doc. 51).[1]  As set forth in more detail below, the court grants the motion and dismisses plaintiff's complaint with prejudice.[2]

---

[1] Plaintiff's motion to appoint counsel is also presently pending before the court. Exercising its discretion, the court denies the motion. The court is convinced, after thoroughly reviewing plaintiff's response to the motion for summary judgment, that plaintiff understands the fundamental issues in his case and is able to present his arguments coherently and intelligently. *See Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004) (no abuse of discretion in denying motion to appoint counsel where district court concluded that plaintiff was able to present his case adequately).

[2] The elements of plaintiff's case are the same whether asserted under Title VII or section 1981. Thus, while this opinion primarily analyzes plaintiff's claims with reference to Title VII, plaintiff's section 1981 claims fail for the same reasons. *See Baca v. Sklar*, 398

## I.      Facts

The following facts are related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Darrin Savage, an African-American, was employed by defendant Delphi Corporation from April 10, 2000 to July 1, 2004 as an Assembler-Battery, which is an hourly position governed by the Delphi-United Auto Workers ("UAW") collective bargaining agreement.   The collective bargaining agreement sets forth 41 shop rules by which union members, including plaintiff, must abide.   A violation of any shop rule results in disciplinary action pursuant to the progressive discipline system also set forth in the collective bargaining agreement.   Under the progressive discipline system, a union member may receive a verbal warning, a written reprimand, a disciplinary layoff, or termination of employment based on the seriousness of the offense.   In addition, the particular disciplinary penalty given to an employee depends upon the number of disciplines administered to the employee in the previous two-year period.

During the course of plaintiff's employment, he was supervised by various individuals, including Robert Humphrey, Keith Gilliland and Rick Gray.   Andy Kopac served as defendant's personnel director during the course of plaintiff's employment and, according to plaintiff, was Acting Plant Manager at the time of plaintiff's discharge.   Plaintiff received a number of disciplinary actions throughout the course of his employment and he contends that each of these actions was based on his race.   On January 8, 2001, plaintiff received a disciplinary layoff for excessive time off the job and restricting output when he took a thirty-minute break.   On February

F.3d 1210, 1218 n.3 (10th Cir. 2005)

16, 2001, plaintiff received a 10-day disciplinary layoff, again for restricting output. In this circumstance, plaintiff turned his machine to the "off" position to stop product from coming to him because he "got behind" in his work. On September 14, 2001, November 9, 2001 and May 30, 2002, plaintiff received written reprimands for unapproved work absences. On September 18, 2001, plaintiff received a three-day disciplinary layoff after he agreed to work overtime and then left the plant before the end of his shift without permission. Defendant suspended plaintiff on November 30, 2001 for failing to follow a direct order from a supervisor. Plaintiff, however, suffered no pay loss from this layoff and it was ultimately removed from plaintiff's personnel file as a result of the settlement of a grievance filed by the union on plaintiff's behalf. At the end of 2001, plaintiff received a verbal reprimand from Mr. Gilliland based on plaintiff's delay in returning to his job assignment after a break.

Plaintiff also claims that toward the end of 2001 and into 2002, several of his coworkers interfered with his job performance and that Mr. Gilliland, on the basis of plaintiff's race, failed to investigate plaintiff's complaints about his coworkers. In addition, plaintiff claims that Mr. Kopac, on one occasion in 2001, began a discussion with plaintiff using the phrase, "Look here, son." Plaintiff contends that Mr. Kopac's use of the word "son" was discriminatory.

On March 25, 2003, plaintiff received a disciplinary layoff for restricting output. According to plaintiff, a switch on his machine was turned to the "off" position and he was unaware of it. On June 24, 2003, plaintiff received a disciplinary layoff for refusing to follow a direct order of Mr. Gilliland. Plaintiff claims that on August 7, 2003, his supervisor Rick Gray threw a battery at his feet that had a bad welding job and told plaintiff that he "better not get any more

batteries back there like this."   According to plaintiff, Mr. Gray was speaking very loudly and "cussing" at him.   Plaintiff left the plant because he was "scared" and did not return for nearly a month–on September 2, 2003.   When he did return, he received a 30-day disciplinary  layoff for leaving the plant during working hours without permission.   On October 23, 2003, plaintiff received a written reprimand for an unapproved work absence and four days later, on October 27, 2003, plaintiff received a disciplinary layoff for an unapproved work absence.

On July 1, 2004, Mr. Gray assigned plaintiff to load batteries.   In response, plaintiff told Mr. Gray that he wanted to "put in a call" to his union committeeman for "discrimination and harassment."   Mr. Gray then walked away and when he returned 10 minutes later, plaintiff had still not started the assignment.   At that point, Mr. Gray told plaintiff that he needed to get to work and plaintiff again told Mr. Gray to call plaintiff's committeeman.   Mr. Gray then gave plaintiff a direct order to do his job.   Plaintiff did not do so.   Plaintiff's union representative overheard the exchange between plaintiff and Mr. Gray and advised plaintiff to go to his work station and that he would be there in a moment.   In response, plaintiff "hollered" twice that he was not going to work for "this racist motherfucker."   Mr. Gray, like plaintiff, is African-American.   Plaintiff admits that he tape-recorded his comments and that his comments referenced Mr. Gray.   Defendant then terminated plaintiff's employment for refusal to follow a direct order of a supervisor, refusal to do his job assignment and using abusive language to his supervisor.

Plaintiff claims that his discharge was based on his race and in retaliation for plaintiff's filing of two EEO charges, his filing of NLRB charges, his intent to exercise his workers' compensation rights and his use of disability leave.   Additional facts will be provided as they relate

to plaintiff's particular claims.

## II.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Id.* (citing Fed. R. Civ. P. 56(e)). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.    Plaintiff's Racial Discrimination Claims

Plaintiff alleges that each and every one of the disciplinary actions taken by his supervisors and described above were based on plaintiff's race.[3]    As plaintiff has no direct evidence of

---

[3]The record reflects that plaintiff received a disciplinary layoff on December 13, 2001 for restricting output. While plaintiff remembers being written up at that time, he does not recall any details about the incident. When asked in his deposition to identify facts suggesting that this particular layoff was discriminatory, plaintiff replied that he simply could not remember any details at all. The court concludes, then, that plaintiff does not intend to assert a separate discrimination claim based upon his December 13, 2001 layoff.

Similarly, while defendant suggests that plaintiff received a verbal reprimand on June 28, 2004 for reporting late to work, plaintiff asserts that he did not receive a verbal reprimand and was not disciplined in any respect for this violation because his supervisor at the time, Rick Gray, feared that plaintiff would retaliate against him by filing a grievance against Mr. Gray for his calling plaintiff a "smart mouth mother-fucker," (an allegation which Mr. Gray denies).

discrimination, the court analyzes plaintiff's claims under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). That is, plaintiff must first establish the elements of a prima facie case of discrimination. *See Sandoval v. City of Boulder, Colorado*, 388 F.3d 1312, 1321 (10th Cir. 2004). Once plaintiff establishes his prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If defendant meets its burden, then plaintiff must respond by showing that there is a genuine dispute of material fact as to whether defendant's asserted reasons for the challenged actions are pretextual. *Id.* If plaintiff presents evidence that defendant's proffered reasons for the employment decisions are pretextual, plaintiff can withstand a summary judgment motion and is entitled to go to trial. *Id.*

A.     *Prima Facie Case*[4]

         To establish a prima facie case under Title VII, plaintiff must show, *inter alia*, that he suffered an adverse employment action. *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir.

─────────────────────

Clearly, then, plaintiff is not asserting a claim based on this event.

         [4]In its motion for summary judgment, defendant contends that plaintiff, as part of his prima facie case, must come forward with evidence that similarly situated employees outside the protected class were treated more favorably than plaintiff. According to defendant, plaintiff has not satisfied this element of his prima facie case. The Tenth Circuit, however, has expressly held that a plaintiff is not required to come forward with evidence of similarly situated employees to establish a prima facie case. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n.6 (10th Cir. 2000) ("Nothing in the case law in this circuit requires a plaintiff to compare herself to similarly situated co-workers to satisfy the fourth element of her prima facie case."). The court, then, summarily rejects this argument.

2004).   Defendant moves for summary judgment on several of plaintiff's claims on the grounds that the claims are based on disciplinary actions or other acts that do not rise to the level of an "adverse employment action" for purposes of Title VII liability.   The court begins with the oral and written reprimands that plaintiff received.   According to defendant, none of the oral or written warnings that plaintiff received constitute adverse employment actions because none of those actions resulted in a loss of pay or benefits.   The key, however, is not necessarily whether those actions resulted in a loss of pay, but whether they had any effect on plaintiff's employment status. *See Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir. 1998) (unsubstantiated oral reprimands are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status).

Defendant appears to concede that the October 23, 2003 written warning that plaintiff received ultimately affected plaintiff's employment status because that warning was factored into the decision to terminate plaintiff under the progressive discipline policy.   This warning, then, does constitute an adverse action.  *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (written warning constituted adverse employment action where the record indicated that the more warnings an employee received, the more likely he or she would be terminated for a further infraction).

The undisputed facts, however, demonstrate that the oral and written reprimands that plaintiff received prior to July 1, 2002 had no impact on plaintiff's employment status and were not considered in the decision to terminate plaintiff's employment.   The collective bargaining agreement between defendant and UAW mandates that management, in determining an appropriate

8

level of discipline under the progressive discipline policy, may not consider any infractions that occurred more than 2 years prior to the present infraction.    Thus, defendant, in deciding to terminate plaintiff's employment on July 1, 2004, was not permitted to consider the written warnings that plaintiff received on September 14, 2001; November 9, 2001; and May 30, 2002; and was not permitted to consider the verbal reprimand that plaintiff received at the end of 2001. Moreover, there is no evidence in the record suggesting that defendant did, in fact, consider these reprimands in contravention of the collective bargaining agreement.    As plaintiff has not shown that these reprimands had any impact on his employment status, no reasonable jury could conclude that the reprimands constituted adverse employment actions.    Summary judgment, then, is appropriate on these claims.  *See Rennard v. Woodworker's Supply, Inc.*, 2004 WL 1260309, *10 (10th Cir. June 9, 2004) (affirming grant of summary judgment on retaliation claim based on written reprimand despite the fact that reprimand expressly stated that future infractions could result in termination; it was undisputed that defendant took no further action against plaintiff with respect to the reprimand and plaintiff showed no "immediate or practical effect on her job status"); *accord Young v. White*, 200 F. Supp.2d 1259, 1274 (D. Kan. 2002) (written reprimand did not constitute adverse employment action in the absence of evidence that reprimand had any negative effect on plaintiff's employment; plaintiff remained employed by defendant three years after reprimand), *aff'd*, 2003 WL 21940941 (10th Cir. Aug. 14, 2003).

Similarly, the disciplinary layoff that plaintiff received on November 30, 2001 does not constitute an adverse employment action, as the layoff did not result in a pay loss and it was removed from plaintiff's personnel file as part of the settlement of a grievance filed by the UAW

on plaintiff's behalf.  Aside from the fact that the layoff was removed from plaintiff's file and that the collective bargaining agreement prohibited reliance on the layoff as it occurred more than 2 years prior to the infraction that resulted in plaintiff's termination, there is no evidence that defendant relied on this layoff in any way in deciding to terminate plaintiff's employment in July 2004.   Plaintiff has not shown, then, that his layoff in November 2001 impacted his employment in any way.  *Compare Russell v. Bd. of Trustees of Univ. of Ill.*, 243 F.3d 336, 341-42 (7th Cir. 2001) (five-day suspension with loss of pay was an adverse employment action); *Kennedy v. General Motors Corp.*, 226 F. Supp. 2d 1257, 1265 (D. Kan. 2002) (disciplinary suspensions constituted adverse employment actions where employee alleged she had not been paid for lost time).

Finally, the court concludes that neither Mr. Kopac's "look here, son" remark nor Mr. Gilliland's failure to investigate plaintiff's complaints about his coworkers interfering with his job performance constitute adverse employment actions.  *See  Heno v. Sprint/United Management Co.*, 208 F.3d 847, 857-58 (10th Cir. 2000) (plaintiff failed to demonstrate that defendant's conduct amounted to an adverse employment action where, *inter alia*, her supervisor and coworkers acted in a "chilly" manner towards her and the human resources department refused to further investigate her complaint once they found out she filed an EEOC complaint); *Amro v. Boeing Co.*, 232 F.3d 790, 795 (10th Cir. 2000) (plaintiff failed to demonstrate that defendant's conduct constituted an adverse employment action where, *inter alia*, the plaintiff's supervisor, after attending a meeting in which the plaintiff advised his supervisor that he thought he was discriminating against him, called him a "fucking foreigner;" placed his hands around the plaintiff's

10

neck and patted him down, apparently to ascertain whether the plaintiff had a tape recorder; threw drawing papers at the plaintiff, causing a paper cut on plaintiff's neck; demanded to search through a folder that the plaintiff was carrying; and, on two other occasions, spoke unpleasantly to the plaintiff).

B.    Pretext

Defendant does not challenge plaintiff's prima facie case with respect to his remaining claims and, thus, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its decisions. *See English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1008 (10th Cir. 2001).   With respect to each of the disciplinary actions taken against plaintiff, defendant asserts that the discipline was given based on the fact that plaintiff had violated a particular shop rule specifically identified in the collective bargaining agreement between defendant and UAW and that such discipline was given in accordance with the progressive discipline policy contained in that agreement.   Defendant has satisfied its "exceedingly light" burden to provide a nondiscriminatory reason for its decision. *See Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002).

Plaintiff, then, may resist summary judgment only by presenting evidence that defendant's reasons are pretextual (*i.e.*, unworthy of belief) or by otherwise introducing evidence of a discriminatory motive.   *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (citing *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir. 2000)).   Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). When assessing whether plaintiff has made an appropriate showing of pretext, the court considers the evidence as a whole. *Id.* (citation omitted).

### 1.    Similarly Situated Employees

In an effort to establish pretext, plaintiff contends, in large part, that defendant treated plaintiff differently from other similarly situated employees who violated the same work rule or work rules of comparable seriousness. This is clearly an acceptable method of showing pretext. *See Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001). The problem, however, is that the record simply does not support plaintiff's argument. The court begins with the disciplinary action that plaintiff received on January 8, 2001 for excessive time off the job and restricting output. According to plaintiff, he received a disciplinary layoff because he took a thirty-minute break while three of plaintiff's Caucasian coworkers often took forty-five minute breaks and were not disciplined. The undisputed facts, however, show that these coworkers–Dan Martin, John Strobel and Dennis Wiggins–were not similarly situated to plaintiff in that the nature of the positions they held was different from the nature of plaintiff's position. *See id.* (plaintiff was not similarly situated to other employee "because of the difference in their positions of employment"). Their positions required them to perform quality checks on machines and those checks routinely were performed while the employees who were operating the machines were on

12

break (thereby minimizing the time that a machine was out of operation).  Because Mssrs. Martin, Strobel and Wiggins worked while other employees were on break, their break times were often adjusted so that they were given one longer break in lieu of multiple shorter breaks.  According to defendant's evidence, while Mssrs. Martin, Strobel and Wiggins have received longer breaks than plaintiff, their total break time has never exceeded the break time allotted to plaintiff under the terms of the collective bargaining agreement.  The fact that Mssrs. Martin, Strobel and Wiggins received longer breaks than plaintiff, then, does not establish pretext.

With respect to the disciplinary actions taken against plaintiff for unapproved absences from work,[5] the record reflects that defendant has routinely disciplined Caucasian employees for unapproved absences.  For example, plaintiff contends that he was disciplined for leaving work early after volunteering to work overtime but that five of his coworkers (one of whom is African-American) were not disciplined when they left work early after volunteering to work overtime.  The undisputed facts, however, show that on the occasion that plaintiff was disciplined, each of his five coworkers who left early had found–prior to leaving–another employee to work overtime in their stead.  These employees, then, were not disciplined (including plaintiff's African-American coworker) and, in light of the fact that they found other employees to cover for them, are not similarly situated to plaintiff.  In any event, the record reflects that defendant has disciplined each of these five employees on other occasions when they violated shop or attendance rules.  Plaintiff

---

[5]Specifically, the court references plaintiff's September 18, 2001 disciplinary layoff; plaintiff's September 2, 2003 disciplinary layoff; plaintiff's October 23, 2003 written warning; and plaintiff's October 27, 2003 disciplinary layoff.

also contends that he was disciplined for an unapproved absence on October 27, 2003 but that four of his coworkers were not disciplined for similar infractions.  The record, however, reflects that each of these four employees received disciplinary actions on numerous occasions as a result of unapproved absences.

On June 24, 2003, plaintiff received a disciplinary layoff for refusing to follow a direct order of his supervisor, Mr. Gilliland.  According to plaintiff, five of his coworkers (one of whom is African-American) have refused to follow direct orders of Mr. Gilliland and were not disciplined.  Plaintiff, however, presents no evidence that Mr. Gilliland knew that these employees were not following his orders and Mr. Gilliland avers that he has no knowledge of these employees refusing to follow his orders.  In the absence of any evidence that Mr. Gilliland knew that other employees were failing to follow his orders, plaintiff's efforts to compare himself to these other employees misses the mark.  *See Morrow v. Wal-Mart Stores, Inc*., 152 F .3d 559, 562-63 (7th Cir. 1998) (in attempting to show disparate treatment through comparison to similarly situated employees, the relevant inquiry is whether management knew about the other employee's behavior); *see also Raleigh v. Snowbird Corp*., 1999 WL 104439, at *2-3 (10th Cir. Mar. 2, 1999) (male plaintiff discharged for engaging in conduct allegedly amounting to sexual harassment failed to present evidence that any female employee accused of a work rule violation received different or more favorable treatment in the absence of evidence that a sexual harassment complaint was lodged against any of the other employees; plaintiff's argument that other employees engaged in the same kind of conduct that he engaged in simply "misses the point").

With respect to his discharge, plaintiff contends that one of his Caucasian coworkers,

Penny Lacy, left her work station for a period of time on July 1, 2004 and was never given a direct order to return to work.    Plaintiff does not dispute, however, that the only occasion on July 1, 2004 when Ms. Lacy was not working was when she was meeting with her shop chairman and that Ms. Lacy returned to her work station at the conclusion of the meeting.    In any event, defendant terminated plaintiff's employment not only for refusing to do his job assignment and refusing to follow the direct order of a supervisor, but also for using abusive language to his supervisor.    Ms. Lacy, then, is not similarly situated to plaintiff in all relevant aspects as there is no suggestion that Ms. Lacy used inappropriate language to a supervisor or in the presence of a supervisor at any time.

Plaintiff also argues that some of his Caucasian coworkers used expletives on the job and were not discharged.[6]    According to plaintiff, Patricia Gilliland, Mr. Gilliland's wife, frequently used curse words when speaking to Mr. Gilliland.    Plaintiff concedes, however, that any preferential treatment Ms. Gilliland received was based on the fact that she was Mr. Gilliland's wife and was not based on factors such as race.    Plaintiff further testified that Pamela Ferguson said "fuck you" to Mr. Gilliland on "a couple of occasions" in 2002 and 2003 and was not discharged.    Plaintiff, however, could not recall any of the circumstances surrounding Ms.

---

[6]Plaintiff contends that one of his coworkers, Kevin Lewis, told him that he had "cussed out two supervisors" and was not disciplined.  The court cannot consider plaintiff's argument with respect to Mr. Lewis as it is inadmissible hearsay.  *See Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.") (quotations omitted).

Ferguson's use of this phrase and, in the absence of any evidence suggesting that Ms. Ferguson was actually being belligerent or quarrelsome at the time she used this phrase (as plaintiff clearly was when he referred to Mr. Gray as a "racist motherfucker"), the court cannot conclude that Ms. Ferguson is similarly situated to plaintiff.   Moreover, there is no suggestion that Ms. Ferguson, at the time she used this phrase, refused to follow a direct order of her supervisor and refused to do her job assignment.

Finally, plaintiff asserts that another coworker, Jonte Gold, referred to a job on one occasion using the expletives "damn" and "fuck" and that, on another occasion, called Mr. Gray a "little bitch" and told him that he was going to "fuck him up."   Mr. Gold was not discharged for his conduct.   While a reasonable jury could certainly conclude that Mr. Gold violated the shop rule against using abusive language to a supervisor, the court nonetheless concludes that Mr. Gold is not similarly situated to plaintiff.   Although Mr. Gold, like plaintiff, swore at a supervisor, there is no allegation that Mr. Gold did so while simultaneously refusing to follow a direct order and while refusing to perform a job assignment.   Thus, the mere fact that Mr. Gold was not terminated does not establish pretext in this case because plaintiff's conduct constituted violations of greater severity.   *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000) (where plaintiff was terminated for swearing at supervisor and physically pushing supervisor, comparison to other employees who had sworn at supervisors did not show pretext).   Moreover, plaintiff has not shown that Mr. Gold or any other employee with whom he seeks to compare his treatment had, like plaintiff, previous infractions under the progressive discipline system that would have mandated a more severe punishment.   *See Rivera v. City & County of Denver*, 365 F.3d 912, 922

(10th Cir. 2004) (similarly situated employees are those who are subject to the same standards governing discipline).[7]

In short, plaintiff has not shown that defendant treated similarly situated employees outside the protected class more favorably.

2.    Plaintiff's Other Efforts to Establish Pretext

Plaintiff, then, has not come forward with evidence that he was treated differently from similarly situated employees who violated work rules of comparable seriousness. This, of course, is not the only method by which plaintiff may establish pretext. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004). Plaintiff may also present evidence that defendant's stated reasons for the disciplinary actions given to plaintiff are false or evidence that defendant acted contrary to a written company policy prescribing the action taken by defendant under the circumstances. *See id.* Plaintiff does not contend that defendant's conduct violated a written company policy in any respect. While it is not entirely clear from plaintiff's response to the

---

[7]While plaintiff contends that African-Americans are treated more harshly under the progressive discipline system than Caucasian employees, he directs the court to only one example of such disparate treatment. According to plaintiff, Dan Martin, a Caucasian coworker, received a written warning the first time he violated the shop rule against leaving a department without permission while plaintiff received a disciplinary layoff the first time he violated this particular shop rule. There is no evidence, however, that Mr. Martin's disciplinary record was the same as or similar to plaintiff's record such that defendant should have factored other infractions into assessing the level of Mr. Martin's punishment. Moreover, the record is devoid of any evidence concerning the circumstances surrounding the occasion when Mr. Martin left his department without permission; without such evidence, the court cannot analyze whether Mr. Martin's written warning arose under circumstances substantially similar to plaintiff's layoff.

summary judgment motion, he appears to suggest that defendant's proffered reasons for the disciplinary actions are false because the disciplinary actions he received were unwarranted or "unfair."

For example, plaintiff contends that he should not have received a disciplinary layoff on February 16, 2001 for "using too many gloves"; plaintiff believes he should have received merely a verbal or written warning.  The document memorializing the layoff, however, does not reference plaintiff's use of gloves and indicates that the layoff was imposed for restricting output.  According to Mr. Gilliland, he suspended plaintiff on February 16, 2001 because plaintiff was absent from the line and his absence caused the work line to shut down, in violation of the shop rule prohibiting restriction of output.  Mr. Gilliland further averred that the layoff had nothing to do with plaintiff's use of gloves.  In his response to defendant's motion, plaintiff contends that he was not absent from the line; he admits, however, that he turned his machine to the "off" position to stop product from coming to him because he "got behind" in his work.  He further does not suggest that he attempted to explain the situation to defendant at the time or that defendant was aware of any mitigating circumstances.  Plaintiff, then, has not shown that the layoff he received on February 16, 2001 was unwarranted.  Stated another way, plaintiff has not shown that he did not violate the shop rule prohibiting restriction of output.

With respect to his September 18, 2001 layoff, plaintiff asserts that the discipline was unwarranted because he notified management that he had "changed his mind" about working overtime (which he had previously agreed to work) before his regular shift ended.  Even if plaintiff did notify management that he had changed his mind, plaintiff has not demonstrated that he did not

violate the shop rule prohibiting an employee from leaving the plant during a shift without permission.   There is no evidence, for example, that management excused plaintiff from the overtime shift that he had agreed to work or otherwise permitted plaintiff to leave the plant early. There is no evidence that defendant failed to discipline other employees who left early without finding someone to work in their stead.   Similarly, with respect to his September 2, 2003 disciplinary layoff for the leaving the plant without permission and failing to return to work for nearly a month, plaintiff simply explains why he left the plant on August 7, 2003.   Significantly, he does not contest the fact that he left the plant without permission; he simply asserts that he had a good reason for doing so.   He does not suggest that he notified defendant of his reason at the time he left the plant or at any time thereafter.   The record does not reflect that defendant had any information whatsoever about plaintiff's whereabouts or his rationale for leaving the plant. Plaintiff, then, has not shown that he did not violate the shop rule for which he was disciplined or that any mitigating circumstances existed of which defendant had knowledge at the relevant time.[8]

In the same vein, plaintiff contends that he did not deserve the disciplinary layoff he received on March 25, 2003 for restricting output because the restriction was not his fault–a switch on the machine was turned off and plaintiff was not aware that it was turned off. Significantly, however, plaintiff does not contest that he violated the rule prohibiting restriction of output nor does he suggest that he made defendant aware of any extenuating circumstances

---

[8]The court does not mean to suggest that defendant should not have or would not have disciplined plaintiff in the same manner if mitigating circumstances existed of which it was aware.  The court is simply attempting to explain to plaintiff why it is rejecting his argument that defendant "unfairly" disciplined plaintiff on multiple occasions.

which defendant might have considered prior to disciplining plaintiff.   In other words, the mere fact that the restriction was caused by a switch on the machine avoids the relevant inquiry–whether defendant believed that plaintiff had restricted output and acted in good faith on that belief in disciplining him for violating the rule against restricting output.

With respect to the written warning that plaintiff received on October 23, 2003 for an unapproved absence, plaintiff contends that Mr. Gilliland had in fact approved plaintiff's absence on that day as a vacation day.  However, plaintiff also states that he was the only employee that Mr. Gilliland ever disciplined for taking an approved vacation day and that all other employees, including all other African-American employees, were permitted to take vacation days without being disciplined.   Because plaintiff concedes that other African-American employees were treated more favorably than him in this regard, plaintiff's evidence does not support an inference that the disparate treatment he received was based on discrimination against plaintiff as an African-American.   *See Baker v. Blue-Cross Blue Shield of Kansas, Inc.*, 2005 WL 852708 (10th Cir. Apr. 14, 2005) (no inference that the disparate treatment was based on discrimination against plaintiff as an African-American in light of evidence that other African-American employees were treated more favorably than plaintiff).

Finally, with respect to his discharge, plaintiff suggests that the sanction was unwarranted because he did not use abusive language "to any supervisor" as the shop rule prohibits.   In that regard, plaintiff contends that he did not call Mr. Gray a "racist motherfucker" during a conversation with Mr. Gray; rather, he called Mr. Gray a "racist motherfucker" (twice) during a discussion (admittedly loud enough so that Mr. Gray heard the expletive) with his union

representative.   While plaintiff may not have violated the literal terms of the particular shop rule, it seems fairly obvious that plaintiff violated the spirit of the rule by calling his supervisor a "racist motherfucker" in close enough proximity to ensure that his supervisor heard the comment.   He also contends that he never "refused" to work on July 1, 2004.   He admits, however, that he never began working at any time after Mr. Gray repeatedly directed him to go to work.   In short, plaintiff has not shown that defendant's proffered reasons for terminating plaintiff's employment on July 1, 2004 was pretextual in any respect.

For the foregoing reasons, no reasonable jury could conclude that any of the disciplinary actions taken against plaintiff, including his discharge, were based, even in part, on plaintiff's race. Summary judgment, then, is granted on plaintiff's claims of race discrimination.

## IV.    Plaintiff's Retaliation Claim

Plaintiff asserts in the pretrial order that defendant terminated his employment as a result of plaintiff's use of disability leave; his intent to exercise his workers' compensation rights; and his filing of NLRB and EEOC charges.    Title VII, however, only protects individuals from retaliation for opposing a practice made unlawful by Title VII.   *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1267 (10th Cir. 2005) ("Title VII makes it an unlawful employment practice for an employer 'to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter.'") (quoting 42 U.S.C. § 2000e-3(a)). Thus, plaintiff's claim must be dismissed as a matter of law to the extent it is based on his use of disability leave, his intent to exercise his workers' compensation rights, and his filing of NLRB

21

charges. *See, e.g., Washington v. American Stores Co.*, 2000 WL 1234310, at *1 (7th Cir. Aug.

30, 2000) (plaintiff's NLRB appeal could not form the basis for her retaliation claim under Title

VII as Title VII protects from retaliation only those complaints of unlawful employment practices

that are proscribed by Title VII).[9]

      With respect to plaintiff's claim that defendant terminated his employment based on

plaintiff's filing of EEOC charges, defendant contends that summary judgment in its favor is

warranted as plaintiff has no evidence that defendant's proffered reason for terminating plaintiff's

employment is pretextual.  The court agrees.  As plaintiff has no direct evidence of retaliation, his

claim is analyzed using the basic allocation of burdens set forth in *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973).  *See Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1212

(10th Cir. 2003).  Under the *McDonnell Douglas* framework, plaintiff has the initial burden of

establishing a prima facie case of retaliation, which requires him to show that he engaged in

protected opposition to discrimination; he suffered an adverse employment action; and there is

a causal connection between the protected activity and the adverse employment action. *See id.*  If

he establishes a prima facie case, the burden shifts to defendant to articulate a legitimate,

---

[9]While plaintiff did not preserve such claims in the pretrial order, he suggests in his
response to the motion for summary judgment that defendant retaliated against him for other
activities, including refusing to work overtime, having medical restrictions, going on a
scheduled break and getting injured on the job.  As these activities are not protected under Title
VII, plaintiff cannot state a retaliation claim under Title VII based on these activities.  While
plaintiff also asserts that defendant retaliated against him for threatening to file a grievance
with the union, the record reflects that the substance of the potential grievance was not
discrimination; rather, plaintiff intended to complain about non-racial abusive language
allegedly used by his supervisor.  This activity, then, would not be protected under Title VII
even if plaintiff had preserved such a claim in the pretrial order, which he did not.

nondiscriminatory reason for the adverse employment decision. *See id.* If defendant offers a legitimate, nondiscriminatory reason for its actions, the burden reverts to plaintiff to show that defendant's proffered reason was a pretext for retaliation. *See id.*

In support of its motion for summary judgment, defendant contends that plaintiff cannot establish a causal connection between any protected activity he may have engaged in and his discharge. As defendant highlights, it did not terminate plaintiff's employment until nearly three years after plaintiff filed his first EEOC charge and ten months after he filed his second EEOC charge. Given the significant length of time between plaintiff's protected activity and his discharge, no reasonable jury could infer a retaliatory motive. Stated another way, the mere fact that defendant terminated plaintiff's employment three years after plaintiff filed his initial EEOC charge and ten months after he filed a second charge, without more, is wholly insufficient to establish the requisite causal connection. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 878 (10th Cir. 2004) (ten-month period between protected activity and discharge, without more, is "too long a time lapse" to support an inference of retaliation); *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999) (plaintiff failed to demonstrate causal connection between her protected activity of complaining about alleged bias in earlier interview process for one position and adverse employment decisions leading to her rejection for second position two years later); *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir. 1982) (plaintiff failed to establish prima facie case of retaliation where three years passed between the filing of her charges and her termination).

Plaintiff sets forth no additional evidence to establish the causation element of his

retaliation claim. Moreover, as explained above in connection with plaintiff's discriminatory discharge claim, plaintiff has not shown that defendant's proffered reasons for terminating plaintiff's employment are pretextual. Summary judgment, then, is warranted on plaintiff's retaliatory discharge claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 51) is granted and plaintiff's complaint is dismissed in its entirety. Plaintiff's motion to appoint counsel (doc. 64) is denied.

**IT IS SO ORDERED.**

Dated this 7th day of June, 2005, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge